# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00682-COA

**BELTON WAYNE SIMS A/K/A BELTON SIMS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/26/2021 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | JEFFERSON DAVIS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ASHLEY LAUREN SULSER |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/13/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., GREENLEE AND EMFINGER, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.    Belton Sims was convicted of capital murder in the Jefferson Davis County Circuit Court.  The underlying felony charge was felonious abuse and/or battery of a child—his four-year-old son.  The circuit court sentenced Sims to life imprisonment without eligibility for parole in the custody of the Mississippi Department of Corrections and ordered him to pay a $25,000 fine and court costs.  On appeal, Sims challenges the sufficiency and weight of the evidence.  Additionally, he claims that the circuit court erred by admitting Exhibit 11v—an autopsy photo—into evidence.  Finding no reversible error, we affirm Sims' conviction and

sentence.

## FACTS AND PROCEDURAL HISTORY

¶2.     Around 3:35 a.m. on August 5, 2016, Belton Sims arrived at the emergency room with his four-year-old son Messiah Griffith.  According to Nurse Katrina Lockhart, Sims stated that Messiah was not breathing and that he had drowned in the bathtub.  However, Messiah had multiple abrasions and contusions to the head, neck, trunk, and extremities as well as a severe head injury.  Dr. Herbert Floyd, the emergency room physician who treated Messiah, noted that he had the worst widespread trauma that he had ever seen.  When Nurse Lockhart noticed the bruises all over Messiah's body, she told Sims, "No, [he] did not drown." Likewise, Dr. Floyd did not find any signs of drowning.  Although it appeared that Messiah was already dead upon his arrival at the hospital, attempts were made to resuscitate him. When Sims was eventually told that Messiah was in fact deceased, he did not display any emotion.[1]

¶3.     The deputy coroner, Katherine Stevens, arrived at the hospital around 4:30 a.m.  Sims told her that he had gotten home around 11:00 p.m. and that Messiah had been at his grandmother's house.  He said that he gave Messiah a bath, went to retrieve a towel from the other end of his trailer, and when he returned to the bathroom, he realized that Messiah had drowned.  According to Stevens, she asked Sims what happened between 11:00 p.m. (when he got home) and 3:35 a.m. (the time that he and Messiah arrived at the hospital), but Sims did not have a "real explanation."  According to Stevens, she saw Sims outside the

---

[1] The record indicates that Messiah was pronounced dead at either 3:48 a.m. or 3:57 a.m.

2

emergency room later and noted that he looked as if he was "fixing to run." Stevens told law enforcement that she thought they should "handcuff [Sims] and put him in the car."

¶4.     Around 9:00 a.m., Dr. Mark LeVaughn performed an autopsy on Messiah's body.[2] He noted that Messiah had various injuries—abrasions, contusions, bruising, and blunt impact injuries—to his head, neck, back, chest, abdomen, and extremities.[3] Dr. LeVaughn described Messiah's injuries as "significant" and "severe." And he noted that Messiah had internal abdominal bleeding and "multiple areas of bleeding under the scalp."

¶5.     Dr. LeVaughn took photographs during the autopsy. At trial, Exhibit 11v was admitted into evidence over defense counsel's objection. Dr. LeVaughn explained that Exhibit 11v was a photograph of Messiah's head after Dr. LeVaughn made an incision and peeled back the scalp tissue to expose the skull during the autopsy.[4] He further explained that he found widespread hemorrhaging underneath Messiah's scalp. Although no hemorrhaging existed on the surface of the brain, Dr. LeVaughn found excess swelling, which he described as extremely serious. According to Dr. LeVaughn, Messiah would have been immediately symptomatic.

¶6.     Dr. LeVaughn testified that there was no evidence that Messiah had drowned. Rather, the cause of death was "multiple blunt trauma due to a beating." According to Dr.

---

[2] At trial, Dr. LeVaughn testified as an expert in the area of forensic pathology.

[3] Dr. Floyd and the deputy coroner indicated that it appeared as though Messiah had different stages of bruising, and Dr. LeVaughn pointed out which scars on Messiah's body were old scars.

[4] On cross-examination, Dr. LeVaughn reiterated that Messiah did not arrive to the autopsy with his scalp tissue peeled back; rather, it was done during the autopsy.

3

LeVaughn, at least some of Messiah's injuries were consistent with being struck with a curtain rod that he noticed in photographs presumably from the crime scene. Although Dr. LeVaughn could not establish an exact time of death, he believed that Messiah died "fairly quickly" after incurring his injuries. Specifically, he testified that Messiah likely received the fatal injuries less than six hours before his death. Additionally, Dr. LeVaughn testified that if Messiah's body temperature was below 94 degrees when he was brought to the hospital, as Dr. Floyd indicated, then he would have been dead for several hours.

¶7. After the autopsy was performed, Investigator Frank Riley with the Mississippi Bureau of Investigations interviewed Sims at the police department. During the interview, Sims maintained that he had picked up Messiah from his grandmother's house and given him a bath around 11:00 p.m. After he returned from getting some towels, he found Messiah lying on his side in the bathtub and then performed CPR. Sims stated that Messiah had been in a bike wreck earlier that evening and that Messiah had complained of his stomach hurting. However, Dr. LeVaughn later testified at trial that Messiah's injuries were not consistent with a bike wreck. Sims also mentioned that he had drunk some vodka earlier that evening.[5]

¶8. According to Investigator Zack Jackson with the Jefferson Davis County Sheriff's Department, law enforcement did not find any water in the bathtub while searching Sims' trailer. Additionally, he indicated that with the exception of one or two small water droplets on the outside of the bathtub, law enforcement did not find any water on the floor around the tub either. He also noted that law enforcement did not find any bath towels. According to

---

[5] Sims requested to talk with law enforcement again two days later; however, Investigator Riley believed that Sims simply wanted to get out of jail.

Investigator Jackson, Sims' trailer looked as if it had been cleaned.

¶9. At trial, the mothers of Sims' children—Shantania Applewhite and Brittany Griffith—testified about events that had occurred on the night of Messiah's murder. Applewhite testified that she thought she saw Sims with LeDesmond Johnson—an alleged drug user—at a Family Dollar store around 9:50 p.m. After she returned to her mother's house, Sims drove up and seemingly wanted to take their son Connor with him. Although Connor previously had stayed with Sims without incident, he did not want to go with Sims that night. Applewhite testified that Sims became angry and said that she and her mother would pay for not letting him get his son and that she would not make it to work the next morning. According to Applewhite, someone woke her up around 2:00 a.m. or 3:00 a.m. and told her that the tires on her and her mother's vehicles were flat.[6] When Deputy Terrance Cooley with the Jefferson Davis County Sheriff's Department arrived at 3:34 a.m., Applewhite called Sims to see if he would admit to essentially slashing the tires. However, one of Sims' relatives answered the phone and said that Messiah was deceased.

¶10. Messiah's mother Brittany testified that she had stayed with Sims for several days leading up to the night of Messiah's murder. That evening, she got off work and called Sims, who said that Messiah was with his grandmother. Around 10:00 p.m., Brittany met Sims to give him some clothes for Messiah seemingly because she was not sure if she would stay with Sims that night. At that time, Sims indicated that he was headed back to his trailer to give Messiah a bath. Brittany testified that she and Sims continued to text each other and

---

[6] Applewhite's mother told law enforcement that whatever happened to the tires must have happened after she went to bed at 2:00 a.m.

5

then eventually agreed that she would go to Sims' trailer. But when she arrived around midnight, Sims did not appear to be there. Brittany testified that she waited for ten to twenty minutes and noticed another vehicle as she was leaving. When she got near the end of the road, Sims called her and asked why she left. According to Brittany, Sims sounded mad, so she turned around. But then Sims drove past her. Brittany testified that she ultimately went back to her mother's house, and her brother called her and told her to check on Messiah around 2:00 a.m. or 3:00 a.m. When she called Sims, he asked her, "Who told you?" Then Brittany learned that Messiah allegedly had drowned. However, on the way to the hospital, she received a text from Sims' phone that said Messiah was "good." Finally, Griffith testified that Sims and Messiah initially had a good relationship, but Messiah seemed to be afraid to be around Sims in the month leading up to his death. She recalled that Messiah had marks on his chest as if someone had pinched him, and his ear looked as though someone had twisted it after previously visiting Sims.

¶11. After the State rested its case, the defense moved for a directed verdict. The court denied the motion, and then the defense requested a mistrial or, in the alternative, a continuance because three defense witnesses had not appeared to testify. The court allowed the defense to make a proffer of the witnesses' testimony but ultimately denied the motion for a mistrial or continuance.

¶12. Although LeDesmond Johnson failed to appear to testify, his prior statement was read to the jury at trial. In his statement, Johnson indicated that he was with Sims when he went to pick up clothes for Messiah from Griffith, and afterward, they went to Sims'

6

grandmother's house to get Messiah. Johnson stated that he spoke to Messiah while he was walking in the house and then "heard all type of noise." But he stated that he "did not know what he was really doing." Then Johnson heard three hard knocks. Finally, he stated that he and Sims left around 11:30 p.m. or 11:40 p.m., and Sims dropped him off at 1:25 a.m.

¶13. Finally, the defense called Sims' cousin Stephanie Turner to testify.[7] Turner testified that she lived with her grandmother and that she essentially had babysat Messiah on the day of his murder. She indicated that she went to get cigarettes after Sims picked up Messiah. She also indicated that at the time, she did not hear anything out of the ordinary inside Sims' trailer. But sometime later, she went back outside, and Sims was crying and doing CPR on Messiah. According to Turner, she had never seen Sims treat Messiah harshly.

¶14. After the defense rested its case, the circuit court denied Sims' renewed motion for a directed verdict. Ultimately, the jury considered the evidence presented at trial and found Sims guilty. After the denial of his motion for judgment notwithstanding the verdict (JNOV) or a new trial, Sims appealed.

## DISCUSSION

¶15. On appeal, Sims challenges the sufficiency and weight of the evidence. Additionally, he claims that the circuit court erred by admitting Exhibit 11v—a color autopsy photo—into evidence. We will address each issue below.

### I. Whether the evidence was sufficient to convict Sims.

---

[7] Not long after questioning began, the judge held a bench conference during which he noted that Turner appeared to be "high as a kite." Ultimately, it was decided that Turner was capable of forming words and that her credibility would be a question for the jury.

¶16.    Sims claims that the circuit court should have granted his motion for a directed verdict or his motion for JNOV because the State did not prove that he was the person who committed the crime.

¶17.    "A criminal defendant has several procedural vehicles available to him for challenging the sufficiency of the evidence." *Russell v. State*, 296 So. 3d 217, 223 (¶16) (Miss. Ct. App. 2020) (quoting *Myles v. State*, 774 So. 2d 486, 490 (¶15) (Miss. Ct. App. 2000)). "A challenge to the sufficiency of the evidence 'can be raised in a motion for directed verdict made at the end of the case for the prosecution, a request for a peremptory instruction at the end of all of the evidence or the motion for a directed verdict at that point, or finally, a motion for judgment of acquittal notwithstanding the verdict.'" *Id*. (quoting *Myles*, 774 So. 2d at 491 (¶15)). "When the sufficiency of the evidence is challenged on appeal, we review the circuit court's ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." *Id*.  In this case, Sims filed a motion for JNOV, which the circuit court denied.

¶18.    "When reviewing a challenge to the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at (¶17) (Miss. Ct. App. 2020) (quoting *Reynolds v. State*, 227 So. 3d 428, 436 (¶32) (Miss. Ct. App. 2017)). "The issue on appeal is not whether the reviewing court would have found the defendant guilty; rather, the conviction must be affirmed if there was sufficient evidence for 'any rational trier of fact' to have rendered a guilty verdict." *Id*.

¶19. To obtain a conviction, the State had to prove that Sims killed Messiah while engaged in the commission of the crime of felonious abuse and/or battery of a child. Miss. Code Ann. § 97-3-19(2)(f) (Supp. 2015).

¶20. At trial, the State presented evidence that around 3:35 a.m. on August 5, 2016, Belton Sims arrived at the hospital with his four-year-old son Messiah who had various injuries—abrasions, contusions, bruising, and blunt impact injuries—to his head, neck, back, chest/abdomen, and extremities. At the time, Belton claimed that Messiah had drowned in the bathtub. Although Messiah appeared to be dead when he arrived at the hospital, attempts were made to resuscitate him but were not successful.

¶21. Dr. LeVaughn, the forensic pathologist who performed Messiah's autopsy, noted that Messiah had internal abdominal bleeding and "multiple areas of bleeding under the scalp." He further explained that he found widespread hemorrhaging underneath Messiah's scalp and excess swelling of the brain. According to Dr. LeVaughn, Messiah would have been immediately symptomatic.

¶22. Dr. LeVaughn testified that there was no evidence that Messiah had drowned. Rather, the cause of death was "multiple blunt trauma due to a beating." According to Dr. LeVaughn, at least some of Messiah's injuries were consistent with being struck with a curtain rod that he noticed in photographs presumably from the crime scene. Although Dr. LeVaughn could not establish an exact time of death, he believed that Messiah died fairly quickly after the injuries occurred. Specifically, he believed Messiah's fatal injuries occurred less than six hours before he died. Additionally, Dr. LeVaughn testified that if Messiah's

body temperature was below 94 degrees when he was brought to the hospital, as Dr. Floyd indicated, then he would have been dead for several hours.

¶23. At the hospital, Sims told the deputy coroner that he got home around 11:00 p.m., gave Messiah a bath, and that Messiah had drowned while he was retrieving a towel from the other end of his trailer. When the deputy coroner asked Sims what had happened between 11:00 p.m. and 3:35 a.m., he did not have a "real explanation." The deputy coroner also testified that at one point Sims looked as though he was "fixing to run" from the hospital.

¶24. During his interview with law enforcement, Sims mentioned that he had drunk vodka earlier. Additionally, the mother of at least one of Sims' children—Applewhite—testified that Sims became angry the evening that Messiah was murdered when his other son refused to go with him. And she indicated that she believed that Sims was responsible for essentially slashing her and her mother's tires in retaliation. Finally, Messiah's mother Brittany testified that Messiah initially had a good relationship with Messiah, but Messiah seemed to be afraid to be around Sims in the month leading up to his death. She recalled that Messiah had marks on his chest as if someone had pinched him, and his ear looked as though someone had twisted it after previously visiting Sims.

¶25. Sims seemingly takes issue with the fact that the evidence presented at trial was circumstantial. However, this Court has held that "a conviction may be had on circumstantial evidence alone." *McCray v. State*, 263 So. 3d 1021, 1028 (¶19) (Miss. Ct. App. 2018) (quoting *Williams v. State*, 122 So. 3d 105, 108-09 (¶17) (Miss. Ct. App. 2013)); *accord Nevels v. State*, 325 So. 3d 627, 631 (¶12) (Miss. 2021). Additionally, "all the proof need

10

not be direct[,] and the jury may draw any reasonable inferences from all the evidence in the case." *Walker v. State*, 21 So. 3d 663, 669 (¶10) (Miss. Ct. App. 2009) (quoting *Campbell v. State*, 278 So. 2d 420, 423 (Miss. 1973)). As stated, evidence was presented that Messiah's fatal injuries occurred less than six hours before he died, he would have been immediately symptomatic, and he died several hours before arriving at the hospital. Taking this evidence into consideration with the evidence that Messiah was in Sims' care from approximately 11:00 p.m. to 3:35 a.m. when they arrived at the hospital, a rational juror could have inferred that Sims was the person who killed Messiah.

¶26. After viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

## II. Whether the jury's verdict was against the overwhelming weight of the evidence.

¶27. Sims claims that the jury's verdict was against the overwhelming weight of the evidence and, therefore, he is entitled to a new trial.

¶28. "In reviewing the denial of a motion for a new trial based on an objection to the weight of the evidence, this Court will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Grace v. State*, 281 So. 3d 986, 992 (¶18) (Miss. Ct. App. 2019) (quoting *Kirk v. State*, 160 So. 3d 685, 697 (¶31) (Miss. 2015)). "The evidence is weighed in the light most favorable to the verdict." *Id*. "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those

11

decisions belong solely to the jury." *Thompson v. State*, 302 So. 3d 1230, 1234 (¶11) (Miss. Ct. App. 2020) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)).

¶29. Sims asserts "[b]ased on a lack of proof of culpability, the testimony and evidence in this case [are] unsupportive of a conviction for capital murder[,] and a miscarriage of justice has occurred requiring a reversal and new trial in the alternative to an acquittal." However, as discussed, the State presented sufficient evidence to show Sims's culpability. The jury listened to the witnesses testify at trial and assessed their credibility. The jury also resolved any conflicts in the evidence and found Sims guilty.

¶30. Considering the evidence presented at trial, we do not find the verdict to be "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Grace*, 281 So. 3d at 992 (¶18). Accordingly, the circuit court did not err by denying Sims' motion for a new trial.

### III. Whether the circuit court erred by admitting Exhibit 11v into evidence.

¶31. Finally, Sims claims that the court erred by admitting Exhibit 11v—a color autopsy photo—into evidence. He asserts that the photo did not have any probative value because it was not needed to prove Messiah's injuries or cause of death.

¶32. "Admission of photographs by the trial court is reviewed for abuse of discretion." *Morrison v. State*, 332 So. 3d 396, 401 (¶26) (Miss. Ct. App. 2022) (quoting *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019)). "A decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion." *Id*.

¶33. Mississippi Rule of Evidence 403 states, "The court may exclude relevant evidence

12

if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." With respect to the admissibility of photographic evidence, "some probative value is the only requirement needed." *Morrison*, 332 So. 3d at 402 (¶27) (quoting *Martin*, 289 So. 3d at 705 (¶7)). "[E]ven if the photograph is gruesome, grisly, unpleasant, or even inflammatory, it still may be admitted so long as it has probative value and its introduction serves a meaningful evidentiary purpose." *Id*. (quoting *Mosley v. State*, 307 So. 3d 1261, 1268 (¶26) (Miss. Ct. App. 2020)). This Court has described a "meaningful evidentiary purpose" as "one that describes the circumstances of the killing, its location, or the cause of death or supplements a witness's testimony." *Id*. (quoting *Mosley*, 307 So. 3d at 1268-69 (¶26)).

¶34. Before trial, Sims filed a motion to suppress photographs, including autopsy photos. At a hearing, the court indicated that the photo at issue was "fairly gruesome." Defense counsel argued that Sims would stipulate to the cause of death, thus leaving the photo without any probative value. In response, the prosecutor asserted that the photo was probative for discussing the circumstances surrounding Messiah's death. Additionally, the prosecutor later asserted that the photo would aid Dr. LeVaughn's testimony in showing the extent and location of the injury. Ultimately, the circuit court admitted the photo into evidence. However, the defense was acknowledged as having a continuing objection to the photo at trial. On appeal, Sims reasserts that the photo did not have any probative value because defense counsel stipulated to the cause of death—child abuse.

13

¶35. In *Martin*, the sole issue on appeal was whether the circuit court erred by admitting two autopsy photos into evidence. *Martin*, 289 So. 3d at 705-06 (¶8). The defendant offered to stipulate the cause of death as blunt-force trauma. *Id*. at 706. However, our supreme court noted that

> even where the issue for which the photograph is introduced is ultimately stipulated to, "as a general rule, the fact that a photograph of the deceased in a homicide case might arouse the emotions of jurors does not of itself render it incompetent in evidence so long as introduction of the photograph serves some legitimate, evidentiary purpose."

*Id*. at 707 (¶12) (quoting *Miller v. State*, 740 So. 2d 858, 864-65 (¶24) (Miss. 1999)).

¶36. Here, Sims has failed to demonstrate any prejudice arising from the admission of Exhibit 11v. Dr. LeVaughn thoroughly explained to the jury that Messiah did not arrive to the autopsy with his scalp tissue peeled back; rather, that was done during the autopsy. The autopsy photos—including Exhibit 11v—were used to explain the extent of Messiah's injuries as well as the injuries that led to his death. Furthermore, Exhibit 11v aided Dr. LeVaughn's testimony. Specifically, Dr. LeVaughn explained that the head injury would have caused Messiah to be immediately symptomatic. This evidence could have been used by the jury to infer that Sims was the person who killed Messiah.[8] Accordingly, we find that the circuit court did not abuse its discretion in admitting Exhibit 11v.

¶37. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS,**

---

[8] Sims relies on *Welch v. State*, 566 So. 2d 680, 685 (Miss. 1990), in which the supreme court found that various photographs of the victim's dissected body had no probative value. For the reasons discussed, Exhibit 11v had probative value and therefore was properly subject to being admitted at trial.

14

**McDONALD, LAWRENCE, McCARTY, SMITH, AND EMFINGER, JJ., CONCUR.**